[Appeals of The Fidelity Ins. Co. and Charles Lennig.]

is entirely ignorant, though the same does not relate to the party's own business, he will be liable as for a fraud."

All that applies to the very person who made the profession, or assumption, and representations, and to no other. Nor could any other person be held liable therefor in the absence of proof that he procured the act to be done, or participated in the doing of it. The mere relation of principal and agent does not imply that the principal is responsible for such acts done by the agent while transacting the business with which he was intrusted. It is not to be inferred from the fact of agency that the agent is authorized to profess to be an expert, and thus competent to give advice. Upon other grounds representations by the agent may bind the principal.

It is said that the expert is liable as for deceit or false warranty. Such liability may exist in a class of cases where there is no moral turpitude. If the expert has skill and adequate information of the subject of which he speaks, and makes representations which he believes to be true, though untrue, to a party who relies on them, is he liable for deceit which involves allegation and proof that he knowingly made the false representations? Upon this there is no present occasion to intimate an opinion, nor need reference be made to the views of Mr. Bigelow as expressed in the work already cited.

We are of opinion that the motion for re-argument should be denied.

Re-argument refused.

# Appeal of The Fidelity Insurance Trust and Safe Deposit Company. Appeal of Charles Lennig et al.

1. Several parties, who were owners of bonds of a railroad company about to be sold under foreclosure of a mortgage securing the same, entered into an agreement that in case of the purchase of the railroad in their interest as bondholders they would not claim their proportion of the proceeds of the sale, but would take in lieu thereof bonds to be issued in a re-organization of the company. There was no stipulation in the agreement as to which of the bondholders should purchase the property, nor as to contribution towards the expenses of the sale and of the re-organization of the railroad. A., one of the bondholders, undertook to buy at the sale, but the property was bid above A.'s limit and sold to B., another party, who subsequently transferred the title to A., for advances made by A. to him, and for prior indebtedness. A. began to re-organize the railroad and requested the other parties to the agreement to join in the payment of the expenses, which they refused to do,

and they afterwards filed a bill in equity against A. for an account of the proceeds in his hands:

*Held*, that conceding the purchase of the road and its re-organization by A. was done in fulfilment of the agreement, and thus was to enure to the benefit of the other contracting parties, yet the latter were debarred, by their refusal to share in the expenses, from claiming any interest in the purchase.

2. Yeager & Grim's Appeal, 4 Out., 88, followed.

March 27, 1884.   Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, GREEN and CLARK, JJ.   STERRETT, J., absent.

APPEAL of The Fidelity Insurance Trust and Safe Deposit Company from a decree of the Court of Common Pleas, No. 2, of *Philadelphia county:*   Of January Term, 1884, No. 26.

APPEAL of Charles Lennig, John L. Erringer and James B. Ramsey, from the same decree:   Of January Term, 1884, No. 26½.

This was a bill in equity by Charles Lennig, John L. Erringer, James B. Ramsey and George W. Hall, complainants, against The Fidelity Insurance, Trust and Safe Deposit Company, and Stephen A. Caldwell, defendants, to compel the defendants to account to the complainants for the proceeds realized from the sale of certain bonds of the Delaware River Railroad Company, which were issued to the said The Fidelity Insurance, Trust and Safe Deposit Company after a foreclosure of a mortgage upon the Delaware *Shore* Railroad Company, and a re-organization by the purchasers under the name of the Delaware *River* Railroad Company.   After answer filed the cause was referred to Mayer Sulzberger, Esq., as examiner, and afterwards to him as master, from whose report the facts appeared to be as follows:

Thomas L. Ogden was the builder of the railroad and principal owner of the stock of the Delaware Shore Railroad Company.   The road extended from the West Jersey Railroad to the Delaware river a few miles below Woodbury.   To raise money for its construction Mr. Ogden had raised money upon his own notes and given as collateral security the mortgage bonds of the railroad company.   The plaintiffs Lennig, Erringer and Ramsey, each held $4,000 of these notes, and each were secured by $8,000 of bonds.   The plaintiff Hall held notes to the amount of $4,500, and bonds to the amount of $26,000.   The Fidelity Company held notes to the amount of $26,750, and bonds to the amount of $81,000.

The railroad proved to be an unprofitable enterprise, and in the spring of 1879 foreclosure proceedings were begun upon the mortgage, and at the first sale a bid of $100,000 was received but not accepted, and the property withdrawn.

10 OUTERBRIDGE.—10.

Ogden then sought to arrange a settlement with his creditors, the principal ones being the plaintiffs and the defendants herein, his negotiations being carried on through one James W. Boyd, the broker who had sold the plaintiffs their notes. The road was again advertised to be sold on July 26, 1879, and meanwhile the negotiation had culminated in an agreement which was prepared under the supervision of Caldwell, and was signed by Messrs. Lennig, Erringer and Ramsey, as follows:

PHILADELPHIA, July 25, 1879.

We the undersigned, holders of the notes of Thomas L. Ogden with bonds of the Delaware Shore Railroad Company as collateral, and which said railroad and franchises are about to be sold under proceedings had upon the mortgage made by the said Delaware Shore Railroad Company to secure the payment of the principal and interest of the said bonds, do hereby agree that in case of the purchase of the said railroad company, its rights and franchises, for our and each of our interests as holders of the said bonds as collateral security, we nor shall either or any of us claim our proportion of the cash that would be coming to us from the proceeds of said sale when made; and do further agree that in lieu thereof we will accept and take such first mortgage bonds as may be issued in a re-organization of said company, in the same ratio that the present bonds held by us respectively bear to the principal of said above-mentioned mortgage, and which said new bonds so issued in a re-organization as aforesaid are to be held by us as collateral security for the notes of said Thomas L. Ogden held by us.

Witness at signing:          CHARLES LENNIG,
JAMES W. BOYD.               J. L. ERRINGER,
                            JAMES B. RAMSEY.

The plaintiff Hall was absent from the city when this agreement was made, but he assented to it, was represented at its execution by Boyd, who as Hall's agent verbally agreed to it for him, and the master found as a fact that Hall was a party thereto.

On the day after the agreement was signed, to wit, on July 26, 1879, the railroad and its franchises were sold under the foreclosure proceedings. Ogden became the purchaser, and a day or two afterwards he transferred his bid to Stephen A. Caldwell (acting for the defendant corporation), who took title thereto. None of the plaintiffs was present at the sale, and they testify that the reason of their absence was their reliance upon the Fidelity Insurance, Trust and Safe Deposit

Company to protect their interests according to the provisions
of the agreement.

Mr. Ramsey, one of the plaintiffs, testified, that before the
sale he received a notice thereof, and that he went to the
office of the Fidelity Insurance, Trust and Safe Deposit Com-
pany; that he saw Mr. Caldwell; that he held the notice
before Mr. Caldwell, who was sitting at his desk, and asked
Mr. Caldwell whether it was essential that he, Ramsey,
should attend the sale; that Mr. Caldwell's reply was, "no, I
think not, we have the matter in hand, we are giving it atten-
tion."    Mr. Caldwell, himself, being interrogated upon this
matter, testified, that it was quite possible that he had seen
Mr. Ramsey before the sale, but had no distinct recollection
of the fact.

The corporation defendant was represented at the sale by
Wilkinson, an employee, who was instructed to bid as high as
$30,000, and who stopped bidding at that figure.    Other bid-
ders, however, went on, and the property was sold to Ogden
for $35,500.

In order to raise money to complete his purchase, Ogden
within a few days made an application to the Fidelity Com-
pany for a loan, which, after some negotiation, was granted
upon condition that Ogden should pledge the property pur-
chased as security for the new advances as well as his old
indebtedness, and it appears that Mr. Caldwell also stipulated
that the other Ogden note-holders should be permitted, if
they so desired, to join with the Fidelity Company in the
arrangement upon the same terms as themselves.

The sum of $10,001.40 in cash was needed to pay off the
liens prior to the mortgage and expenses of the foreclosure,
and also $10,958.60 for dividends due bondholders other than
the plaintiffs and the corporation defendant.    An additional
sum of $10,000 was estimated to be necessary for repairs and
improvements, making the total amount needed $30,960.    The
proposition was accordingly made to the plaintiffs to contri-
bute ratably to this fund, either on the basis of their whole
claims or upon the basis of their claims less their dividends
from the proceeds of sale.    A schedule was prepared and
submitted to them, but they refused to contribute as re-
quested.    Meantime on August 9, 1879, the defendant Cald-
well took title to the railroad, and on October 31, 1879,
conveyed it and its franchises to a new company organized
under the name of The Delaware River Railroad Company.
On November 1, 1879, the new company issued bonds secured
by a mortgage of the road, franchises, &c., for $65,000, which
bonds were delivered to the corporation defendant to secure
the purchase money advanced, the amount expended for im-

provements, and the former indebtedness of Ogden. Ogden died soon afterwards, and the road was operated by his executor, who succeeded him as President, but it never earned enough to pay the interest on the money advanced. Early in 1881 the corporation defendant sold its claim against Ogden, together with the bonds held as collateral, to Messrs. Dupont for $61,750.

Upon the question of the liability of the defendants to account to the plaintiffs, the Master reported inter alia as follows : " If we assume for a moment that Ogden's bid had been allowed to stand, and that the Fidelity Insurance, Trust and Safe Deposit Company had not negotiated with him, the conclusion is inevitable that the terms of the sale could not have been complied with, and that a re-sale would have been ordered of which the plaintiffs would have had notice, and at which they could have protected their interests by bidding. It seems to the Master that the defendants could not thus take away any rights of the plaintiffs. To hold under these circumstances that the adoption of Ogden's bid by the defendants was a purchase totally disconnected from the agreement, and free from any of its obligations or trusts, would be to encourage quibbles and technical devices, to fritter away solemn compacts. The Master, therefore, finds that the purchase by the defendants of the railroad, franchises, and property of the Delaware Shore Railroad Company was a purchase under the terms and within the meaning of the agreement of July 25th, 1879.

" This leaves for consideration only one question, viz.: whether the plaintiffs' refusal to contribute ratably for the payment of the outlays, as demanded by the defendants, constituted a waiver or forfeiture of the plaintiffs' rights under the agreement. The plaintiffs earnestly deny that they were liable to contribute anything. They point to the agreement, and find in it only one duty imposed on them, viz., that they shall not claim their cash dividends out of the proceeds of the foreclosure sale. A performance of this duty entitles them, according to their contention, to receive first mortgage bonds of the reorganized company, in the same ratio that their bonds, held as collaterals, bore to the whole amount of the foreclosed mortgage. . . . . .

" The Master finds that at the time of entering into the agreement of July 25th, 1879, neither the plaintiffs nor the defendants contemplated or hoped for any advantage beyond the payment of their claims. It would seem to follow, therefore, that the plaintiffs and the defendants stood on an equal footing. If money was required to carry out the provisions of the agreement there was no valid reason why the plain-

tiffs should not ratably contribute. If they expected to share in the profits of the bargain, they were equally bound to bear their part of its burdens.

"If the case turned upon this simple question, it would doubtless be necessary to dismiss the bill. There were, however, other circumstances to complicate the matter. After the purchase by the defendants, they dealt with the property as their own, without the leave, assistance, or advice of the plaintiffs, or any of them. They did more. They gave away, as a gratuity to Ogden, an integral part of the property purchased for the joint benefit of the plaintiffs and defendants, to wit: that part of the value of the road represented by the shares of stock issued by the re-organized railroad company, being all over $65,000, the amount of the mortgage bonds issued by the company. If, for the sake of the argument, we assume that this conduct was a fair compliance with the terms of the agreement, it is still difficult to see how the defendants could be entitled arbitrarily, and against the wishes of the plaintiffs, to spend $10,000 for improvements, and then to demand a contribution including such expenditure on pain of a forfeiture of the plaintiffs' rights under the agreement. The very foundation of the plaintiffs' duty to contribute was the fact of their being jointly interested with the defendant, and the least right conferred by such joint interest was to be consulted as to the propriety of spending money in improvements.

"The Master is therefore of opinion that the refusal of the plaintiffs to contribute the amounts demanded by the defendant, under the circumstances attending such demand, was not a waiver of their rights, and they are entitled to relief."

The Master accordingly stated their account as follows :
Net proceeds of sale of bonds....................$61,750 00
Amount advanced by the Fidelity Insurance, Trust
   and Safe Deposit Company, expenses
   and liens.........................$10,001 40
Dividends to other stockholders....... 10,958 60
Repairs and improvements............ 10,000 00
Interest on advances................. 3,196 32
                              ————— 34,156 32

Leaving net balance for distribution...........$27,593 68 which amount he distributed ratably among the plaintiffs and the defendant company. He further reported that the bill should be dismissed as to Caldwell.

To this report The Fidelity Insurance Trust and Safe Deposit Company filed inter alia the following exceptions :

2. The learned Master, having stated that at the sale of July 26th, 1879, Thomas L. Ogden became the purchaser of

the railroad and franchises of the Delaware Shore Railroad Company, erred in reporting that the said Ogden " a day or two afterwards transferred his bid to Stephen A. Caldwell, acting for the defendant corporation, who took title thereto" without also reporting the terms upon which such transfer was made to Mr. Caldwell, the evidence being uncontradicted that such transfer was made only as collateral security, the title to the property remaining in Thomas L. Ogden.

8. The learned Master erred in reporting that the purchase by the defendants of the railroad, franchises, and property of the Delaware Shore Railroad Company was a purchase under the terms and within the meaning of the agreement of July 25th, 1879.

11. The learned Master erred in reporting that the refusal of the plaintiffs to contribute the amounts demanded by the defendants, and the circumstances attending such demand, was not a waiver of the plaintiffs' right, and that the plaintiffs are entitled to relief.

The complainants also filed numerous exceptions inter alia as follows :

1. The learned Master erred in reporting " that the Fidelity Insurance Trust and Safe Deposit Company is entitled to a credit for the amount of the advances for improvements."

2. The learned Master erred in not finding and reporting that under the agreement of July 25, 1879, the complainants were not bound to contribute toward the payment of any advances made by the defendants after the purchase of the said road by the defendants.

3. The learned Master erred in reporting that " if money were required to carry out the provisions of the agreement, there was no valid reason why the plaintiffs should not ratably contribute."

All the exceptions filed were dismissed by the court, and the Master's report was confirmed (no opinion filed.) Whereupon both parties took these appeals, assigning for error the action of the court in dismissing their respective exceptions, inter alia as above.

*R. C. Dale*, with whom was *Samuel Dickson*, for the Fidelity Co., appellants in No. 26.—The Supreme Court will reverse a Master's finding for erroneous inferences and conclusions of fact : Kutz's Appeal, 4 Out., 75 ; Burke's Appeal, 3 Id., 350.　　The evidence does not establish any agreement upon the part of the Fidelity Company to become the agent of the plaintiffs for the purchase of the property upon the terms set out in the plaintiffs' bill.　The only agreement for a purchase by the Fidelity Company of which there

is any evidence is that admitted, i. e., an agreement with Ogden that if the Fidelity Company became the purchasers they would permit the plaintiffs, who were Ogden's creditors, to come in with them upon equal terms. The Fidelity Company did not bind themselves to bid the property up to any particular sum, but were left to act in the matter as their own interest dictated. In the exercise of a fair business discretion, Mr. Caldwell fixed $30,000 as the limit of his bid, and the property having been subsequently bid up to $35,500 and at that figure taken by Ogden, the matter might have been permitted to rest there, in which case both the plaintiffs and defendants would have taken their dividend from the fund, and no one could have maintained a claim against the Fidelity Company for failure to become the purchasers of the property. The contingency not having occurred upon which the plaintiffs' rights were to take effect, as expressed in the paper of July 25, 1879, the utmost claim that they can assert as against the Fidelity Company is, that in the new and independent arrangement, which was subsequently made between the Fidelity Company and Ogden, the plaintiffs should be permitted to share the advantages which were thereby secured by the Fidelity Company; but this could only be upon the condition of assuming an equal share of its burdens. This offer was made, and the plaintiffs refused to avail themselves of it.   Yeager & Grim's Appeal, 4 Out., 88.

*J. Edward Carpenter*, for Lennig et al., appellants, in No. 26½.—The defendant corporation undertook to purchase the road, reorganize it, and give the plaintiffs new bonds in proportion to the new mortgage, as the bonds then held by them were proportioned to the amount of the then existing mortgage, the plaintiffs undertaking on their part not to bid at the sheriff's sale, and not to claim in cash their shares as bondholders from the proceeds of the sale.

The transfer of Ogden's bid of $35,500 to the Fidelity Trust and Safe Deposit Company, and their purchase of the Delaware Shore Railroad and its franchises, was a purchase under the terms and within the meaning of the agreement, which contained no provision that the plaintiffs should be called upon to pay any money toward the purchase of the property, or for other expenses incident to the ownership of the road. The case of Yeager and Grim's Appeal, 4 Out., 88, differs from the present case in several essential particulars. In that case it was agreed that the purchase money should be paid by the three parties who had agreed to buy at the assignee's sale, and the appellee refused to pay his proportion, whereas, in the case in hand, the plaintiffs agreed to accept

new bonds for those which they then held, in the re-organization. They had nothing to do with the purchase. The defendants and Ogden had settled between them as to the prospective ownership of the road, and the defendants had agreed to purchase themselves and furnish the purchase money, and then to reimburse the plaintiffs by giving them new bonds.

Mr. Justice PAXSON delivered the opinion of the Court April 14, 1884.

The learned court below dismissed the exceptions and confirmed the Master's report without filing an opinion. We are left, therefore without the aid which the discussion of the case by that court would have given us.

We find no fault with the Master's findings of fact, nor up to a certain point, with his conclusions. Assuming that the agreement embodied in "Exhibit A" was participated in by the defendants below, and was binding upon them as found by the Master, we are of opinion that he was clearly right in holding that the plaintiffs below were bound to contribute their pro rata share of the purchase money and the expenses. The most that can be claimed for "Exhibit A" is that it was a contract that in case the defendants should purchase the road, it should be for the joint benefit of the parties to the agreement. This implied necessarily that the purchase was to be at their joint expense; that is, that the purchase money and expenses should be contributed by all the parties in proportion to their respective interests. The present contention that the defendants were bound to advance the plaintiffs' share of purchase money and expenses is without merit. There is nothing in "Exhibit A" from which such an agreement can be reasonably inferred. The property was sold to Ogden for $35,000. The defendants paid the purchase money, of which the sum of $10,001.40 was applicable to the expenses of the foreclosure proceedings, and the payment of prior liens, and the sum of $10,958.60 was applicable to the payment of the dividends of bondholders other than the plaintiffs and the defendant corporation. No portion of this purchase money was contributed by the plaintiffs, or by either of them. On the contrary, when applied to shortly after the sale to contribute their respective shares, they flatly refused. As one of the witnesses remarked: "They hooted the idea of the thing, and would not have entertained it for a moment."

Up to this point we agree with the Master. But in discussing the liability of the plaintiffs to contribute, he says: "If the case turned upon this simple question, it would doubtless be necessary to dismiss the bill. There were, however, other

circumstances to complicate the matter. After the purchase by the defendants, they dealt with the property as their own, without the leave, assistance, or advice of the plaintiffs, or any of them. They did more. They gave away, as a gratuity to Ogden, an integral part of the property purchased for the joint benefit of the plaintiffs and defendants, to wit: That part of the value of the road represented by the shares of stock issued by the re-organized railroad company, being all over $65,000, the amount of the mortgage bonds issued by the company."

Just here we think the Master fell into error. It was contended by the defendants that they did not purchase the property under " Exhibit A ; " that they fixed $30,000 as the limit which they authorized their agent to bid ; that he refused to exceed his limit although urged by others to do so ; that the property was finally knocked down to Mr. Ogden for $35,000 ; that they subsequently advanced him the money to pay for the property and merely took the title as collateral to secure their advances. We need not discuss this view of the case, for conceding the purchase to enure to the benefit of the plaintiffs, all the defendants could be called upon to do was to permit the plaintiffs to come in under the new arrangement. The defendants were not required by " Exhibit A " to purchase the property in any event and without any regard to price. If they gave the plaintiffs an opportunity of coming in and sharing the benefits of the purchase they did all that in equity they could be called upon to do. That they did this appears clearly in the case. The plaintiffs refused to contribute a dollar of the purchase money. With such refusal their right to participate in the direction of the affair, or in the proceeds of the re-sale ceased, and the defendants had the right to deal with the property as their own. The claim of the plaintiffs to share the benefits of the transaction, and yet leave the burden and risk to the defendants, cannot be sustained. Such mode of dealing was pointedly condemned in Yeager and Grim's Appeal, 4 Outerbridge, 88. The appellees contend, however, that Yeager and Grim's Appeal differs from the present case for the reason that in that case it was agreed that the purchase money should be paid by the three parties who had agreed to buy at the assignee's sale, and the appellee refused to pay his proportion ; whereas in the case in hand, the plaintiffs agreed to accept new bonds for those which they then held, in the re-organization. We are unable to perceive this distinction. We regard " Exhibit A " as an agreement between certain of the bondholders of the Delaware Shore Railroad Company, that one of their number, to wit, the defendant company, should buy in the said railroad for their joint account and benefit, and that in the proposed plan of re-organization the

parties thereto would accept new bonds in lieu of the old bonds held by them. This is a very common proceeding in such cases, and necessarily involved an outlay of money. The sum of $10,001.40 was required to pay the costs of foreclosure, expenses and prior liens; and the further sum of $10,958.60 to pay other bondholders not parties to the agreement. By whom was this money to be paid? Manifestly by the parties interested, unless it was expressly agreed to the contrary. The plaintiffs contend that they were not to pay anything; they say such was their understanding. Their understanding, however, is a matter of no consequence unless it amounted to an agreement with the defendant company, and of this there is no evidence. On the contrary, "Exhibit A," which we must accept as the final understanding of the parties contains nothing from which we can reasonably infer that the defendants were to advance the plaintiffs' share of the purchase money.

Under the view we take of the case the plaintiffs stand in the same position as the other bondholders not parties to "Exhibit A." This entitles them to a dividend out of the purchase money paid by the defendants, but not to participate in the proceeds of the sale made by them. The plaintiff, George W. Hall, appears to have received his share. This is a matter, however, with which we have no concern in this proceeding.

We need not discuss the matter of the $10,000 claimed by the defendants for moneys expended by them in the improvement of the road. Had the plaintiffs contributed their quota of the purchase money they would have been in a position to question such outlay. But until such payment they had no interest in the purchase. They declined to pay any part of the assessment upon the ground that they were not obliged to contribute anything, either as purchase money or otherwise.

The plaintiffs also appealed from this decree, and have filed numerous assignments of error. What has been said renders a discussion of them unnecessary. The plaintiffs' appeal is dismissed at their respective costs.

The appeal of the defendant company is sustained; and as to them the decree is reversed, and the bill dismissed at the costs of the appellees.